# RUBINSTEIN & COROZZO, LLP

COUNSELORS AT LAW

260 MADISON AVENUE, 22ND FLOOR
NEW YORK, N.Y. 10016
TELEPHONE (212) 545-8777; FAX (917) 722-8206
INFO@RUBCORLAW.COM

RONALD RUBINSTEIN
JOSEPH R. COROZZO

ANGELA D. LIPSMAN (NY; NJ)

Of Counsel:
MARSHALL A. MINTZ
LAURA OPPENHEIM

Government to respond by
November 25, 2020 (noon).

SO ORDERED:
Date: 11/11/2020  *Richard M. Berman*
Richard M. Berman, U.S.D.J.

November 10, 2020

Hon. Richard M. Berman
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re: United States v. Todd LaBarca
11 CR 12 (RMB)

Dear Judge Berman,

I represent Defendant Todd LaBarca ("LaBarca"). Mr. LaBarca hereby moves to Reconsider and/or "Reargue"[1] his Motion for Compassionate Release.[2]

The Court denied Mr. LaBarca's motion on two grounds: Mr. LaBarca's alleged dangerousness to the community and the Court's analysis of the 18 U.S.C. § 3553(a) factors. The Decision and Order dated October 28, 2020 (ECF # 1021) ("Order") was silent on whether Mr. LaBarca would have leave to renew, i.e. should the number of persons at the facility infected with COVID-19 rise or should Mr. LaBarca's health deteriorate further.

I. The Flexibility The Court Has Under The First Step Act, *United States v. Brooker* and *United States v. Rodriguez* Would Alter the § 3553(a) Analysis.

Mr. LaBarca's last submission was filed on August 21, 2020. At that time, "it was not wholly clear that the Court had authority [to reduce a sentence under the First Step Act to something other than time-served], as some courts had read the compassionate release statute as authorizing either immediate release or no release, but nothing in between. However, [in September], the Second Circuit Court of Appeals recognized that the statute provided such

---

[1] More accurately, as the Court's Order was based on the papers submitted, if the Court schedules oral argument, it would be the first time Mr. LaBarca's motion is argued.

[2] In the alternative, Mr. LaBarca had moved for a recommendation that he be transferred to home confinement pursuant to the CARES Act, an argument that the Court rejected in a footnote without setting forth the Court's reasons.

1

RUBINSTEIN & COROZZO, LLP

flexibility," *United States v. Rodriguez,* 2020 U.S. Dist. LEXIS 181004, *1 - *2 (S.D.N.Y. September 30, 2020) (citing *United States v. Brooker*, 2020 U.S. App. LEXIS 30605, 2020 WL 5739712 [2d Cir. September 25, 2020]).

This is significant because, in denying Mr. LaBarca's Motion, the Court relied on an assessment that "LaBarca has served less than half of the twenty-three-year sentence imposed." Decision and Order p. 3. See also Id. p.1, p. 8.[3]

However, under *Brooker*, "Section 3582(c)(1)(A) does not demand that this Court choose between immediate release and wholesale denial. Instead, it allows for any sentence reduction," *Rodriguez*, 2020 U.S. Dist. LEXIS 181004, *20.

Thus, instead of denying Mr. LaBarca's motion in its entirety on the grounds that 117 – 118 months of imprisonment would be insufficient to satisfy the § 3553(a) factors or to ensure that Mr. LaBarca is no longer a danger to the community, the Court can reduce Mr. LaBarca's sentence of imprisonment from 276 months to a term that the Court would find sufficient to provide just punishment, reflect the seriousness of the offense, protect the public from future crimes of the defendant, and promote respect for the law, as well as satisfy the other § 3553(a) factors.

There is no dispute that "extraordinary and compelling circumstances exist under Section 3582", Decision and Order p. 4, quoting Gov't Opp. at 14. Per Dr. Galst's report, "Were Mr. LaBarca to contract a coronavirus infection, the combination of his obesity, diabetes, hypertension and respiratory problems would potentially result in his being at high risk for not surviving. This conclusion is supported by a massive amount of epidemiologic published data," Dr. Galst Report, p. 3.

Nor is the risk that he will get Coronavirus miniscule. FCI Schuylkill is located in Pennsylvania, where new cases of the virus are soaring. Janet Pickel, "COVID-19 Numbers Soar in Pa. Record 4,035 new cases Saturday," The Express (November 9, 2020) (Available at: https://www.lockhaven.com/news/local-news/2020/11/covid-19-numbers-soar-in-pa/) ("The Pennsylvania Department of Health reported a one-day record of 4,035 new positive coronavirus cases Saturday"). Schuylkill County, Pennsylvania has the highest COVID risk level, signifying an "Active or Imminent Outbreak." *Schuylkill County, PA COVID-19 data and risk levels,* COVIDActNow.org, Available at: https://covidactnow.org/us/pennsylvania-pa/county/schuylkill_county?s=1304314 (updated November 10, 2020).

According to The New York Times, there are 2,589 cases of Coronavirus in Schuylkill County, Pennsylvania. *Pennsylvania Covid Map and Case Count,* The New York Times, Available at: https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-

---

[3] Though, based on the Bureau of Prisons' projected release date for Mr. LaBarca, Mr. LaBarca now has *less* time left to serve than he has served to date. That is, according to the BOP's Inmate Locator, he currently has 117 months and two weeks left to serve before his projected release date (August 25, 2030), whereas he has now served 117 months and three weeks since the date of his arrest (January 20, 2011).

cases.html#county (updated on November 10, 2020) ("New York Times Map"). This includes 54 new cases on November 9, 2020.[4] According to The New York Times, there have been 123 deaths from Coronavirus in Schuylkill County, Pennsylvania. See New York Times Map.

At least four staff members at FCI Schuylkill currently have the virus, in addition to another staff member at the facility who has recovered.[5] Mr. LaBarca reports that he has observed staff members not wearing masks at the facility and that social distancing is not possible at FCI Schuylkill.[6] The Court noted that the BOP had reported that only one inmate at the facility had tested positive for the virus and had already recovered, Decision p. 6.

However, the defense submits that the number of persons who have tested positive for the virus at the facility present an incomplete picture as Mr. LaBarca reports that only new inmates at FCI Schuylkill are tested for COVID-19. This would mean that the Court cannot rely on the BOP's self-reported COVID-19 statistics, as a lack of testing could conceal the true number of inmates who have this disease.

While the extraordinary and compelling reason recognized by the Government—Mr. LaBarca's heightened risk from the Coronavirus pandemic—would be most compelling during the pandemic, here, as in *Rodriguez*, there are additional extraordinary and compelling reasons for reducing Mr. LaBarca's sentence, which would continue to justify a reduced sentence after the pandemic.

*Rodriguez* recognized that in addition to having a heightened risk from COVID-19 during the pandemic, the heightened restrictions put in place in federal institutions by the BOP in an effort to contain the spread of COVID-19 "made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons... have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal... 'the actual severity of [Rodriguez's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing,' *United States v. Mel,* No. TDC-18-0571, 2020 U.S. Dist. LEXIS 74491, 2020 WL 2041674, at \*3 (D. Md. Apr. 28, 2020) ...this second factor also weighs in favor of a finding of extraordinary and compelling reasons." *Rodriguez*, 2020 U.S. Dist. LEXIS 181004, \*7 - \*8.

---

[4] *Schuylkill County, PA COVID-19 data and risk levels,* COVIDActNow.org, Available at: https://covidactnow.org/us/pennsylvania-pa/county/schuylkill_county?s=1304314 (updated November 10, 2020).

[5] https://www.bop.gov/coronavirus/ (visited November 10, 2020).

[6] "Mr. Labarca... states it is impossible to social distance..." Exhibit C to Response to Gov't. at July 23, 2020 Email from Defense Counsel.

On July 23, 2020, defense counsel requested that the Government obtain from the BOP photographs and video from the facility, which Mr. LaBarca maintains would prove that there is no social distancing at FCI Schuylkill, and also show individuals not wearing masks at the institution. The Government wrote back on July 28, 2020 that "BOP legal responded to say that [they] do not intend to fulfill this request." Exhibit C to Response to Gov't. at July 28, 2020 Email from Government.

RUBINSTEIN & COROZZO, LLP

Here, the restrictions imposed to prevent the spread of COVID-19 included, *inter alia* keeping Mr. LaBarca and other inmates on lockdown 24/7 for months, suspending all social visiting for more than six months, and restricting the programs available to Mr. LaBarca, not to mention that the pandemic delayed his surgery. <u>See</u> LaBarca Consent to Surgery Form – signed by LaBarca in February 2020 (attached and discussed further *infra*).

These restrictions, combined with Mr. LaBarca's ill health (including years of chronic pain), mean that Mr. LaBarca's imprisonment has been significantly "harsher and more punitive than would otherwise have been the case," ***Rodriguez***, at *7.

Thus, this is an additional extraordinary and compelling reason supporting Mr. LaBarca's motion, which would justify a reduction of Mr. LaBarca's sentence even in the event that the Court releases him after the pandemic ends.

***Rodriguez*** also noted a third extraordinary and compelling reason which applies here— the defendant's rehabilitation. We will discuss Mr. LaBarca's rehabilitation further in the next section, but evidence of his rehabilitation during his imprisonment includes:

1. the college courses he completed while incarcerated, during which he made Honor Roll;
2. the certificates that Mr. LaBarca earned while incarcerated; <u>see</u> Exhibit F to LaBarca's Motion and LaBarca's Motion at p. 34 ("while incarcerated, Mr. LaBarca has completed Workplace Safety Training, an Indoor Soccer Referee Class, a Blood Pressure Awareness course, a Sports Psychology course, a Nutrition course, a Driver's Education course, a Parenting class, a Drug Abuse Education course, a non-residential Drug Treatment Program, and an Anatomy course");
3. Mr. LaBarca's spotless prison disciplinary record since his arrest;
4. his PATTERN score, which indicates that his risk of recidivism is low; and
5. Mr. LaBarca's work throughout his incarceration. Mr. LaBarca's current work in the facility entails providing prison units with chemicals aimed to contain the spread of Coronavirus.

Mr. LaBarca has been rehabilitated over the course of his incarceration. He has availed himself of the opportunities that the Court, at the time of sentence, recommended he be provided with, including the chance to furthering his education.[7] (His rehabilitation should also be considered as part of the §3553(a) analysis.)

Wherefore, instead of the Court denying Mr. LaBarca's motion in its entirety on the ground that he has not yet spent enough time in prison for his offenses, the Court should take into consideration the authority to reduce Mr. LaBarca's sentence to something other than time served, and the implications this would have for the Court's analysis of the § 3553(a) factors and the question of dangerousness, which we turn to next.

---

[7] Sentencing Tr. p. 10, L. 19, p. 30, L. 17.

RUBINSTEIN & COROZZO, LLP

II. Mr. LaBarca Would Not Pose a Danger to the Community.

In addition to the fact that the Court can reduce Mr. LaBarca's sentence to something other than time-served, under the First Step Act, the Court can replace the remainder of Mr. LaBarca's term of imprisonment with supervised release[8]—and impose as conditions of the supervised release whatever restrictions the Court should deem necessary.

A lengthy term of supervised release with appropriate restrictions can assure that Mr. LaBarca would not pose a danger to the community. These conditions could include home confinement, electronic monitoring, as well as non-association provisions to keep Mr. LaBarca from communicating with anyone in La Cosa Nostra.

We submit that if Mr. LaBarca is confined to his son's residence,[9] and if his supervised release further prohibits him from communicating with anyone in organized crime, Mr. LaBarca will not pose a danger to the community. See *United States v. Williams*, 456 F. Supp. 3d 414, 419 (D. Conn. April 24, 2020) ("Mr. Williams will be on supervised release at home during the time he would have been incarcerated, addressing any concern as to his danger to any other person or the community"); *United States v. Delgado*, 2020 U.S. Dist. LEXIS 84469, *16 - *17 (D. Conn. April 30, 2020) (same); *United States v. Gileno*, 455 F. Supp. 3d 1, 6 (D. Conn. April 20, 2020) (same); *United States v. Sanchez*, 2020 U.S. Dist. LEXIS 70802, *16 (D. Conn. April 22, 2020) (defendant not a danger where, *inter alia,* "he will be on home-confinement"); *United States v. Indarte*, 2020 U.S. Dist. LEXIS 189970 (W.D. Wash. October 14, 2020) (defendant's incarceration replaced with home confinement; defendant not a danger where, *inter alia,* no contact provision in place to protect the victim); *United States v. Wong Chi Fai*, 2019 U.S. Dist. LEXIS 126774, *10 (E.D.N.Y. July 30, 2019) (compassionate release granted where, *inter alia,* "any remote possibility of dangerousness will be further diminished because Mr. Wong will be released to the custody of his family, his whereabouts will be restricted and he will not be permitted to have contact with his co-defendants or any other associates from his former criminal life. [*United States v. Bellamy,* 2019 U.S. Dist. LEXIS 124219, 2019 WL 3340699, (D. Minn. July 25, 2019)] (granting Compassionate Release motion while imposing conditions to ensure the defendant would 'not have contact with those engaging in criminal activity' and could not 'conduct[] illegal business via telephone')".

Further, the BOP determined that Mr. LaBarca's risk of recidivism is low, see Mr. LaBarca's PATTERN score - Exhibit E to Defendant's Motion and Defendant's Reply.

Pursuant to Application Note 1B(iii) to U.S.S.G. § 1B1.10, the Court "may consider post-sentencing conduct of the defendant that occurred after imposition of the term of imprisonment in determining (I) whether a reduction in the defendant's term of imprisonment is warranted; and (II) the extent of such reduction…"

Hence, we ask the Court to consider that Mr. LaBarca is not the same person today at 49 years old, as he was at the time of sentencing in 2012. He has grown to be a mature man who

---

[8] 18 U.S.C. § 3582(c)(1)(A).

[9] Aside from leaving the residence for medical treatment.

RUBINSTEIN & COROZZO, LLP

now has his priorities in place. He has rehabilitated himself while in prison, including by earning certificates and college credits, making the Honor Roll, working diligently, and staying out of trouble.

Mr. LaBarca has completely clean disciplinary record for the entire 117 – 118 months that he has been incarcerated to date—meaning that he not only did not engage in any violence while incarcerated, but he also has not committed any violations of any kind. See Exhibit D to LaBarca's Response to the Government, indicating a clean disciplinary record.

We know the Court and the Government have little faith in Mr. LaBarca's support network, given his past crimes. The Court quoted the Government's assertion that Mr. LaBarca's letters of support were from people who had suasion over him. Respectfully, the takeaway from the letters from his family and friends is not that they will supervise him and keep him in line.

Unfortunately, the people who supported him, in the past, were unaware of his street life until it was too late. It would be a very strange situation where a person involved in criminal activity shared this with family members or other individuals not associated with criminal activity. Therefore, to suggest that Mr. LaBarca's criminal behavior was in fact facilitated by his loved ones is misplaced.

However, Mr. LaBarca's desire not to be again separated from his 26 year old son, his 10 year old daughter, his father, who is in his 80s and uses an Oxygen tank, and his other loved ones will provide a powerful incentive for Mr. LaBarca to become a law-abiding citizen upon his release. We urge the Court not to discount that incentive.

Mr. LaBarca has proven since his arrest on the instant case that he has learned to put his flesh and blood family ahead of any criminal association. When he saw his son possibly beginning to follow in his footsteps, he put the brakes on that, sending his son to North Carolina to get him out of the neighborhood where John Gotti (the former head of the Gambino crime family) and Joe Massino (the former head of the Bonanno crime family) lived, as did other individuals alleged to be in organized crime. After Mr. LaBarca's intervention, his son went on to earn a college degree and later to become a legitimate small business owner.

Mr. LaBarca's letter to the Court[10] should also give the Court confidence that he is determined not to go back to a life of crime. He is genuinely remorseful, as he expressed in his own words, "I am aware that my actions have had a devastating effect on so many others… As a younger man, I was reckless and stupid… And I am truly sorry for all the pain I have caused my family and the family of the victim." LaBarca's Letter to the Court - Ex. G to Response to Gov.

In January 2021, when Mr. LaBarca has been incarcerated for ten years, his security score will be reduced further and the Bureau of Prisons will classify him for a low security facility.

---

[10] LaBarca's Letter to Court, dated August 7, 2020 – Exhibit G to Response to Government.

RUBINSTEIN & COROZZO, LLP

Mr. LaBarca's medical issues should also factor into the analysis of this issue. In addition to being morbidly obese, his diabetes, and other medical conditions, he may end up losing the use of his right arm, which has atrophied during his time in prison.

If this application is denied in its entirety, Mr. LaBarca will return to society in ten years. But with the Court's ability to extend his supervised release to ten years, plus electronic monitoring and other restrictions fashioned by the Court, Mr. LaBarca can begin to successfully reintegrate into society sooner, without endangering the community.

Of course, to be involved with even one murder is one too many, but it does not follow that everyone ever convicted of murder will be dangerous for the rest of their lives. While we acknowledge the severity of Mr. LaBarca's crimes, we respectfully submit that Mr. LaBarca is not the worst of the worst.[11] Mr. LaBarca did not carry a gun and, outside of the case at bar, he was not involved in violent offenses. It is undisputed that he was not the shooter,[12] nor was he present at the scene when the murder occurred. Although the Court opined at sentencing that, given the nature of Mr. LaBarca's plea, the defendant had given up the ability to assert certain objections to the Presentence Report ("PSR"),[13] the Court may recall that Mr. LaBarca objected to the allegations that he had threatened the extortion victim with a gun or with physical violence, and had presented an excerpt from a transcript of a conversation between Mr. LaBarca and Howard Santos[14] on July 28, 2009 as evidence in support of Mr. LaBarca's objections to the PSR.[15]

Wherefore, Mr. LaBarca would not pose a danger to the community.

---

[11] We note that Courts have already reduced the sentences of individuals who arguably would have been more of a threat to society. For instance, Daniel Mongelli was a former acting captain in the Bonanno organized crime family. His underlying offenses included murder, conspiracy to commit murder and conspiracy to make extortionate extensions of credit, yet he was recently released. *United States v. Mongelli*, 2020 U.S. Dist. LEXIS 205469 (E.D.N.Y. November 3, 2020).

We recognize that the circumstances in *Mongelli* are distinguishable (i.e. the amount of time served, the outbreak in FCI Fort Dix, and Mongelli being diagnosed with the virus). We only bring it up because we do not see how Mr. LaBarca, who is not a member of an organized crime family, let alone ever held any position of power in La Cosa Nostra, would pose a greater danger to the community.

[12] The shooter, Bruno, who had a higher criminal history score than Mr. LaBarca, received a sentence of 21 years.

[13] Sentencing Tr. p. 8.

[14] Santos was a Government cooperator who had spent his life committing crimes, and had recorded LaBarca, providing the key evidence against LaBarca on the Bosshart murder.

[15] Though to clarify, we do not mean to undermine the seriousness of Mr. LaBarca's offenses. Mr. LaBarca takes full responsibility for his crimes.

RUBINSTEIN & COROZZO, LLP

### III. The Need to Provide Medical Care.

While there is no dispute that there are extraordinary and compelling reasons supporting Mr. LaBarca's Motion, the analysis of the § 3553(a) factors was one of the reasons the Court denied Mr. LaBarca's Motion. As the Government and the Court seem to be under the impression that Mr. LaBarca is receiving adequate medical care from the BOP, and as the need to provide proper medical care is one of the § 3553(a) factors, we will address this factor now.[16] However, the following is not meant to replace (or rehash) the extensive discussion of Mr. LaBarca's medical conditions in our prior submissions or the medical records or expert report that were submitted previously.

At sentencing, on July 12, 2012, the Court recognized that the BOP should provide, among other things, needed medical care.[17] Although Dr. Galst did state that Mr. LaBarca "is currently receiving active medical care"[18] in 2020, the record clearly establishes that Mr. LaBarca did not receive adequate medical care throughout his term of incarceration to date. We submit that if he had, he would not have been suffering from constant pain for over seven years. (Not to mention the fact that he became morbidly obese while in prison or that his arm atrophied while he was in the BOP's care.) Mr. LaBarca now has Barrett's syndrome because he was taken off Omeprazole on August 9, 2016, which was three days after he arrived at FCI Schuylkill, without being examined. It was only when the Barrett's syndrome was discovered, more than two years after the prescription had been cancelled, that the BOP placed Mr. LaBarca back on Omeprazole.

Spinal surgery was recommended for Mr. LaBarca while he was still at FCI Gilmer. Finally, on February 25, 2020, Penn State Hospital stated they would be in touch with the patient and set up the exact date and time for the surgery. LaBarca signed a consent for the surgery form on that day. See Consent for Surgery (attached). This consent was only valid for 60 days. The surgery was to be scheduled later, but because of the pandemic it was never scheduled. It defies credulity that in June of 2020 they would be doing the actual surgery in the midst of the pandemic. The Consent expired on April 26, 2020 and, five months after signing the consent form, he was informed that they wanted him to go back to Penn State Hospital—clearly not to have surgery during that visit as no date had been set for the surgery. The only logical conclusion was the purpose of the trip was to sign a new consent form.

To clarify, Mr. LaBarca did not refuse the spinal surgery.[19] He submitted a letter to Dr. Mace specifically stating that he was "NOT REFUSING." Exhibit A to Response to Government

---

[16] His rehabilitation, which also goes to the § 3553(a) factors, has been discussed *supra.* Also discussed *supra* is the fact that the Court's analyzed the § 3553(a) factors in terms of whether Mr. LaBarca should be sentenced to time-served. However, as explained in Section I, reducing Mr. LaBarca's sentence to something other than time-served would change the analysis.
[17] Sentencing Tr. p. 2, L. 24.
[18] Decision p. 4, quoting July 17, 2020 Galst Med. R. at 2.
[19] Though we would not blame Mr. LaBarca if he did refuse to have surgery until after the pandemic was over. Dr. Galst and the Government have recognized that Mr. LaBarca is at higher

RUBINSTEIN & COROZZO, LLP

- LaBarca's Letter to Dr. Mace. The representation by the BOP that he was refusing surgery because "I talked to my wife…and I might be going home soon," Decision and Order p. 5, quoting June 25, 2020 BOP Med. R., is just not true and defies reason as there is no basis that LaBarca would have had any idea in June that he would be home soon.

Mr. LaBarca did sign a refusal to go to the hospital. In the BOP, anything you refuse must be documented and if you do not sign the form, punishment may follow, up to and including solitary confinement. Mr. LaBarca's Letter to Dr. Mace stating that he was not refusing surgery also indicated that he understood that the trip to the hospital would be merely to sign another consent form to have the surgery, rather than being a trip for the surgery itself.

The BOP's allegation that LaBarca "'did not want DM [diabetes] medications as '[he's] not a medication taker,'" Decision p. 5, quoting October 2, 2018 BOP Med. R., makes no sense because Mr. LaBarca was already taking different medications at that time. As noted in the Motion, Mr. LaBarca takes "Duloxetine for his chronic nerve pain, hydrochlorothiazide for hypertension, Omeprazole for acid reflux, and Atrovastatin for his high cholesterol. He had also been on Ranitidine (Zantac) for his acid reflux disease prior to the FDA recalling the product earlier this year." Defendant's Motion p. 31. After Mr. LaBarca's last annual physical, it was recommended that he take Metformin, a Diabetes medication, which he now takes twice a day.

The Government claims that the BOP records state that Mr. LaBarca has been cured of sleep apnea. In the Court's decision, the Court cites the Government's representation that "BOP medical records do not support [LaBarca's] claim to suffer from obstructive sleep apnea – they indicate that the condition resolved in August 2016." Decision p. 5, quoting Gov't Opp. at 6.

You are never cured of sleep apnea. Mr. LaBarca's sleep apnea has not resolved. The BOP at FCI Gilmer, in the Bureau of Prisons Health Services, Inmate Intra-system Transfer report sent to FCI Schuylkill listing Mr. LaBarca's health problems included "obstructive sleep apnea current C-PAP setting of 4." LaBarca 2017 Medical Records at p. 26 – Inmate Intra-System Transfer report. His medical records later allege "Obstructive sleep apnea… Resolved – *lost significant [weight]*" Medical Record – Encounter Date 08/10/2016 10:24 (emphasis in original). The evidence is overwhelming that once at FCI Schuylkill, his weight went significantly up. See, e.g. Exhibits G and H to Defendant's Motion – Photos Showing LaBarca Before and After and Photos Showing Deterioration Over Time.

There is a reason that Mr. LaBarca's weight would be tied to his current sleep apnea. It is my understanding, based on my conversations with Dr. Galst, that sleep apnea is most common in people who are overweight. Therefore, now that Mr. LaBarca has gained 70 pounds in prison and is morbidly obese, his sleep apnea has worsened. I have further been advised by Dr. Galst that the only way a person can resolve sleep apnea is by surgery or, in the case of obese people, by losing weight.

---

risk of dying should he contract COVID-19. If Mr. LaBarca were to have surgery, he would need to be placed under anesthesia, placing him in an even more vulnerable state.

RUBINSTEIN & COROZZO, LLP

Mr. LaBarca is concerned about his weight gain, which is apparently caused by a combination of the medications prescribed for him by the BOP, the poor diet the BOP provides, and his physical inability to exercise. In spite of the Inmate Intra-System Transfer report from FCI Gilmer cited *supra*, no C-PAP machine was provided.

In short, not all of the BOP's representations in Mr. LaBarca's medical records are accurate. In ***United States v. Crowell***, 2020 U.S. Dist. LEXIS 147244 (D.R.I. August 14, 2020), Judge John J. McConnell, Jr., Chief Judge of the District of Rhode Island found that the medical staff at FCI Schuylkill were unreliable. Indeed, according to the District of Rhode Island, "Mr. Crowell's attorney best summed up the situation when she rhetorically asks… '…medical staff and the warden at Schuylkill lied and claimed that he never reported a family history of lupus. What is their explanation for this?'" ***Crowell*** at *5. Here, we would respectfully request a hearing, with BOP witnesses, so this Court can judge the credibility of the FCI Schuylkill medical staff and assess whether Mr. LaBarca is currently receiving adequate medical care from the BOP.

CONCLUSION

As discussed above, Mr. LaBarca would not be a danger to community, especially given the restrictive conditions that the Court can place on his supervised release, such as electronic monitoring, non-association with those in organized crime, and even home confinement. Should the Court reduce his sentence, this supervised release would replace the remainder of his original term of imprisonment.

In analyzing dangerousness, the Court should also look to how Mr. LaBarca has changed since his sentencing in 2012. He is remorseful.[20] His post-sentencing conduct[21] includes earning college credits, making the Honor Roll, earning certificates, working in the institutions he has been incarcerated in, and keeping a spotless disciplinary record for his term to date—which is now approaching ten years. Hopefully, upon reconsideration, the Court will see what the Government has refused to see—that Mr. LaBarca has been rehabilitated during the course of his imprisonment.

The Court's analysis of the § 3553(a) factors—and the Government's analysis—was based on a conclusion that time-served would not be sufficient to satisfy the purposes of sentencing. But even assuming *arguendo* that that were the case, the Court can grant Mr. LaBarca's motion in part and reduce his sentence to something other than time-served—which would require a new assessment of the § 3553(a) factors.

While his heightened danger from the pandemic (already recognized by the Government as extraordinary and compelling), would weigh in favor of a sentence of time-served, here, as in ***Rodriguez***, there are additional extraordinary and compelling reasons which would continue to justify a reduction of his sentence after the pandemic ends. Among these additional reasons are the evidence that Mr. LaBarca has been rehabilitated, and the fact that, between his extreme,

---

[20] Exhibit G to Response to Gov., p. 2.
[21] Application Note 1(B)(iii).

10

RUBINSTEIN & COROZZO, LLP

chronic pain, and the heavy restrictions put in place by the BOP in the agency's efforts to combat Coronavirus, Mr. LaBarca's sentence has been significantly harsher and more punitive than the Court had anticipated at the time of sentencing. *Rodriguez,* 2020 U.S. Dist. LEXIS 181004, *7 - *8.

   WHEREFORE, we respectfully request:

   1. That the Court reconsider the decision regarding Mr. LaBarca's Motion for Compassionate Release/recommendation for Home Confinement and

   2. That the Court schedule a hearing on this application and

   3. For such other and further relief as the Court may deem just and proper.

   Thank you for your consideration.

            Respectfully,

            Ronald Rubinstein, Esq.
            Angela D. Lipsman, Esq.

cc:  AUSA Stephanie Lake (via ECF)

Apr. 15. 2020 11:57AM                                                                    No. 3018   P. 7

 **PennState Health**   4/30/20

| | NAME: LABARCA, TODD |
| | MRN#: ____630   FIN#: ____5981 |
| | MD: Kelleher, MD, John   MD#: 89190 |
| | DOB: ____971   VISIT DATE: 02/25/2020 |
| | LOC: HMC HOGG -   SEX: male |

### CONSENT FOR ANTERIOR CERVICAL DISCECTOMY AND FUSION

Condition For Which Treatment is Proposed:

Compression of the spinal cord / nerve root

1. I authorize my physician, ___Kelleher___ (name), and/or such other staff or resident physicians as my physician may designate to perform upon me (or the patient identified above) the following operation or procedure (for procedures on all paired organs or extremities, the side of the body must be specified as left, right or bilateral, without abbreviations)

   Anterior cervical discectomy with arthroplasty / fusion using autograft / allograft with anterior plate

   C4/5,   C5/6,   C6/7

   I understand that physicians designated by my physician, including but not limited to physicians in The Milton S. Hershey Medical Center post graduate residency program, may be performing important tasks related to my surgery in accordance with The Milton S. Hershey Medical Center policy and, in the case of resident physicians, based on their skill set and under the supervision of an attending physician.

   A team of medical professionals will work together to perform my procedure/surgery. My physician explained to me that he/she may participate in another overlapping procedure/surgery at the same time as mine. This means that my physician will be present for all critical parts of my procedure/surgery but he/she may not be in the room for non-critical portions of my procedure/surgery. At those non-critical times, other medical professionals may perform some aspects of my procedure/surgery as my physician or his/her designee deems appropriate.

   It has further been explained to me that qualified medical practitioners who are not physicians may also perform important parts of my surgery or administer the anesthesia, but only to the extent such tasks are within their scope of practice, as determined by Pennsylvania law, and for which they have been granted privileges by The Milton S. Hershey Medical Center.

   In this consent form, the operation or procedure identified above is referred to as the "procedure." I understand that at the time of my procedure, circumstances may require changing which individual practitioners are involved in performing the procedure.

2. My physician has discussed with me the items that are briefly summarized below:

   (1) The description of the proposed procedure: Decompress the spinal cord / nerve roots

   (2) The material risks of the proposed procedure, including the risk that this treatment may not accomplish the desired purpose:

   Bleeding that may require transfusion or an additional operation; infection that may require long-term antibiotics or a return to the operating room for washout; cerebrospinal fluid leak; nerve or spinal cord injury resulting in new or worse pain, numbness or weakness, paralysis, bowel/bladder/sexual dysfunction; injury to trachea/esophagus/larynx resulting in problems with breathing/swallowing/talking; coma/death.

   (3) The medically reasonable alternative treatments and the risks associated with these alternative treatments: Physical therapy, epidural steroid injections, medications

   (4) What may happen if the proposed procedure is not performed: Pain, weakness, and numbness in arm

3. To the extent the procedure or treatment described above is to be repeatedly performed in the future, I understand and hereby consent to undergo the series of those planned procedures.

4. I am aware that, in addition to the risks specifically described above, there are other risks that are present with respect to any surgical procedure, such as severe loss of blood, infection, risks associated with anesthetic administration, cardiac arrest, and blood clots lodging in the lungs, any of which may require additional corrective surgery or result in death.

MR 31 MED 054   Rev. 11/17                  **CONSENT FOR ANTERIOR CERVICAL DISCECTOMY**

Apr. 15. 2020 11:57AM

No. 3018   P. 8

**PennState Health**

NAME: LABARCA, TODD
MR#: ▮▮▮▮▮630          FIN#: ▮▮▮▮▮981
HO: Kelleher, MD, John   ID#: 89190
DOB: ▮▮▮▮1971           VISIT DATE: 02/25/2020
LOC: HMC HOOG -          SEX: Male

# CONSENT FOR ANTERIOR CERVICAL DISCECTOMY AND FUSION

5. I understand that during the course of this procedure, unforeseen conditions may arise which could require the nature of my procedure to be altered, or that another operation or procedure be performed. I therefore authorize my physician, or other physicians designated by my physician, to provide such medical treatment, or perform such operation or procedures as are necessary and desirable in the exercise of professional judgment.

6. It has been explained to me that there may be circumstances when information must be disclosed or reported pursuant to law, such as if it is determined during the course of the procedure that I have tuberculosis, viral meningitis, or other diseases required to be reported to state and/or federal authorities such as the Pennsylvania Department of Health or Centers for Disease Control and Prevention.

7. I understand the goals and anticipated benefits of the proposed procedure and the likelihood of achieving those goals. I am also aware that the practice of medicine and surgery is not an exact science, and I acknowledge that no guarantees have been made to me concerning the results of the proposed procedure.

8. I agree to receive blood or blood products (red cells, platelets, plasma, cryoprecipitate, or granulocytes) if this need arises prior to, during, and/or after my procedure, up until the time I am discharged from the hospital if I have been admitted. I understand that transfusions are not risk-free, although blood is carefully tested. The risks of transfusion include, but are not limited to: 1) fever, hives, or shaking chills; 2) infections: Hepatitis B, Hepatitis C, HIV (the AIDS virus), bacterial contamination/infection, and other, unknown infections; 3) reactions from a mismatch of blood types; and 4) transfusion associated lung injury (TRALI).

I understand that a transfusion can always be refused. The risks of not receiving transfusion therapy have been explained to me. I understand that receiving my own blood may be a possibility which I should discuss with my doctor.

9. I acknowledge that the information I have received, as summarized on this form, is sufficient for me to consent to and authorize the procedure described above. I have had the opportunity to ask questions concerning my condition, and about the procedure, alternatives and risks, and all questions have been answered to my satisfaction.

10. I impose the following limitation(s) regarding my treatment:   None

11. I authorize the staff of The Milton S. Hershey Medical Center to preserve for scientific or teaching purposes any tissues or parts which may be removed in the course of this procedure, and to dispose of them.

12. I authorize The Milton S. Hershey Medical Center to permit other persons to observe the procedure with the understanding that such observation is for the purpose of advancing medical knowledge. I understand that for certain procedures, representatives of device manufacturers may be present. I authorize the presence of such industry representatives.If my physician believes it is appropriate, I further authorize The Milton S. Hershey Medical Center to obtain photographic or other pictorial representations of the procedure, and to use such representations for scientific or teaching purposes.

13. I certify that all blanks requiring insertion of information were completed before I signed this consent form.

If The Milton S. Hershey Medical Center interpreter services were provided, the following must be documented:

Language _____   Interpreter ID # _____

Patient's Signature (or signature of person consenting on behalf of the patient)       Date/Time   2/25/20   2:00  AM/**PM**

*Optional - Witness to Patient's Signature       Date/Time   _____   AM / PM

Print Physician Name Legibly _____

Physician's Signature       Date/Time   2/25/22   2:00   AM/**PM**

If telephonic consent was obtained, the following information must be provided:

Name of Person to Whom you spoke _____   Relationship of person to patient _____   Date/Time _____   AM / PM

his consent is valid for up to 80 days from the date of the patient's signature unless there is significant change in the patient's condition or consent is revoked by the patient. Use of a witness is at the discretion of the individual obtaining the consent.

## CONSENT FOR ANTERIOR CERVICAL DISCECTOMY